# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# 5:14-cv-128-FDW

| CHRISTOPHER CHARLES HARRIS, | ) |
|---|---|
| Plaintiff, | ) |
| vs. | ) |
|  | ) **ORDER** |
| FNU CONNOLLY, et al., | ) |
| Defendants. | ) |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Connolly, Harris, Hart, and Mayhorn. (Doc. No. 42).

## I. BACKGROUND

### A. Plaintiff's Allegations

Pro se Plaintiff Christopher Harris is a North Carolina prisoner currently incarcerated at the Alexander Correctional Institution in Taylorsville, North Carolina. Plaintiff filed this action on July 18, 2014, asserting that, while a pretrial detainee at the Iredell County Detention Center between April 10, 2012, and October 14, 2013, Defendants violated his constitutional rights by requiring him to live in unsanitary conditions of confinement and by failing to protect him from an assault by another inmate. Plaintiff also alleges that he was a "mental health patient" while detained at the detention center and that Defendants failed to attend to his mental health needs by depriving him of an adequate mental health setting.

The four named Defendants were employed at the detention center at all relevant times.

1

Defendant Bert Connolly was the center's Operations Captain. (Doc. No. 42-2 at ¶ 1: Connolly Aff.). Defendant Ashely Hart was a Lieutenant, and her job duties included supervising jail observation and investigating inmate grievances. (Doc. No. 42-6 at ¶¶ 1-2: Hart Aff.). Defendants Gary Mayhorn and Joshua Harris were both Detention Officers. (Doc. No. 42-5 at ¶ 1: Mayhorn Aff.; Doc. No. 42-4 at ¶ 1: Harris Aff.). Plaintiff purports to bring claims against Defendants for violations of his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments, as well as clams for negligence and gross negligence. Plaintiff seeks injunctive and declaratory relief as well as compensatory and punitive damages. Defendants filed the pending summary judgment motion on August 23, 2015. Plaintiff filed a response on September 3, 2015, and Defendants filed a reply on September 14, 2015.

As to his conditions-of-confinement claim, Plaintiff alleged in the Complaint that between June and August 2012, while he was a pretrial detainee at the detention center, Defendants Mayhorn and Harris refused to give him a mattress to sleep on, and that Plaintiff was forced to sleep on a concrete floor surrounded by feces, urine, and filth. Plaintiff alleged that "the holding cell's condition was unsanitary due to the massive amount of urine, feces, and vomit on both the floor and walls in which the plaintiff was forced to live in for 30 plus days. Plaintiff was also made to go without a shower sometimes up to 8 or 9 days. There were no sanitary items (soap, paper, towels and at times no toilet paper)." (Doc. No. 1 at 9). Plaintiff also alleged that he was designated as a "mental health patient" while at the detention center. Plaintiff alleged that, between June and August 2012, he was placed in a "turtle" suit for 60-plus days and Defendants failed to attend to Plaintiff's mental health needs by not providing him with an adequate mental health setting. (Id. at 8).

As to his failure-to-protect claim, Plaintiff alleged in the Complaint that on May 28,

2

2012, fellow inmate Marcus Ferguson came into Plaintiff's cell and assaulted Plaintiff. Plaintiff alleged that Defendants knew that inmate Marcus Ferguson had threatened to harm Plaintiff, but that Defendants did nothing about it. Plaintiff also alleges that, by placing Plaintiff in an area around other inmates who were not mental health patients, Defendants placed Plaintiff's life, well-being, and safety in jeopardy. (Id.). As for his injuries, Plaintiff alleges that, as a result of Defendants' conduct, he suffered injuries to his back as well as mental and emotional injuries.

B. **Defendants' Summary Judgment Materials**

To support the summary judgment motion, Defendants have presented, among other things, the affidavits of all four Defendants, inspection reports for the detention center, time sheets for Defendants Mayhorn and Harris, Plaintiff's medical progress notes and medical records, and Plaintiff's deposition. Defendants have presented the following evidence on summary judgment:

Plaintiff claims that on May 26, 2012, he was talking on the telephone with his girlfriend when fellow inmate Marcus Ferguson threw a cup of urine on him. (Doc. No. 42-1 at 11: Ex. 1 to Pl.'s Dep.). Plaintiff told a detention officer about the incident, and officers took Ferguson to segregation. (Id.). Plaintiff alleges that, as he was being taken to segregation, Ferguson told Plaintiff he would "get him" when he saw him again. (Id. at 11-12). Plaintiff alleges that he then told the sergeant on duty that Ferguson had threatened him. (Id. at 12). About thirty minutes later, fellow inmate Brian Coleman assaulted Plaintiff. (Doc. No. 42-1 at 4: Pl.'s Dep.; Doc. No. 42-2 at 12: Ex. C to Connolly Aff.). The Iredell County Detention Center contracts with medical provider Southern Health Partners, Inc. to provide medical care to inmates at the detention center. (Doc. No. 42-2 at ¶ 12). Southern Health Partners treated Plaintiff immediately after the assault by inmate Coleman. See (Doc. No. 42-1 at 4; Doc. No. 42-8:

3

Defs.' Ex. 7). Detention Officer Joshua Harris took Plaintiff to Iredell Memorial Hospital, where Plaintiff was treated and released back to the detention center the same day. (Doc. No. 42-1 at 5: Doc. No. 42-8).

Upon his return to the detention center, Plaintiff was placed on anti-suicide watch after calling his girlfriend and stating that he was "going to kill himself." (Doc. No. 42-8 at 15). The detention center's policy is to place inmates on suicide watch after an inmate assault. (Doc. No. 42-2 at ¶ 15). Placement on anti-suicide watch at the detention center includes placing the inmate in a holding cell for observation. (Id. at ¶¶ 15-16). Additionally, clothing and other articles are removed from the inmate's person so the inmate cannot access materials that may be used to commit suicide, and inmates are placed in an anti-suicide smock. (Id. at ¶ 16). Inmates remain on anti-suicide watch until release by a medical professional. (Id.).

Pursuant to detention center policy, Plaintiff was placed in an anti-suicide smock and placed in a holding cell for monitoring and observation, as well as for Plaintiff's safety. When placed in a holding cell, inmates are provided mattresses for sleeping at 10:30 p.m. until 4:30 a.m. during jail sleeping hours, and are observed on a 24-hour monitoring period. (Doc. No. 42-5 at ¶¶ 3; 7; Doc. No. 42-4 at ¶¶ 3; 7). Detention officers and medical staff thereafter monitored Plaintiff. By order dated May 30, 2012, Dr. Anderson released Plaintiff from suicide watch. (Doc. No. 42-8 at 15). As a result, Plaintiff spent about five days in a holding cell under anti-suicide watch. Officers then transferred Plaintiff to the detention center's annex. See (Doc. No. 42-2 at 8: Ex. A to Connolly Aff.). During this time, jail officials learned that Plaintiff was communicating through jail phone calls a plan to escape the jail annex by a diversion based on a medical incident. (Id. at ¶ 22). As a result, jail officials returned Plaintiff to the main jail, where he was placed in isolation. (Id.).

On June 24, 2012, Plaintiff told officers he would hurt himself if he remained in isolation. (Doc. No. 42-1 at 8: Pl.'s Dep.). He was then removed, placed on anti-suicide watch, and again placed in a holding cell for observation and monitoring. (Doc. No. 42-8 at 12). Medical staff evaluated and monitored Plaintiff while he was on suicide watch. See (Doc. No. 42-8). Plaintiff's medical records demonstrate that Plaintiff continued to make statements reflecting suicidal intentions. See (Id.).

Plaintiff continued to receive treatment and remained on anti-suicide watch until Dr. Anderson released him on August 10, 2012. (Doc. No. 42-8 at 10). Plaintiff spent about 45 days total on anti-suicide watch. During this time, Defendants Mayhorn and Harris worked about twenty-two shifts on the same schedule, with only ten shifts worked during the night shifts. (Doc. No. 42-5 at 6-13: Ex. A to Mayhorn Aff.; Doc. No. 42-4 at 6-14: Ex. A to Harris Aff.). After release from the holding cell in August 2012, Plaintiff served out the remaining time as a pretrial detainee without incident. Finally, although Plaintiff alleged in the Complaint that inmate Ferguson assaulted Plaintiff in his holding cell on May 28, 2012, Defendants contend that there is no evidence in the record of inmate Ferguson assaulting Plaintiff in his holding cell on May 28, 2012.

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

5

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. Plaintiff's Claims against Defendant Supervisors Connolly and Hart

The Court first notes that, although Plaintiff seeks to impose individual liability against Defendants Connolly and Hart, his allegations against these two Defendants appear to be solely based on their supervisory status, rather than on any personal participation by these two Defendants in the alleged constitutional violations against him. The doctrine of respondeat

superior is inapplicable to § 1983 claims. To establish supervisory liability under § 1983, a plaintiff must allege facts showing: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Randall v. Prince George's County, Md., 302 F.3d 188, 206 (4th Cir. 2002) (quotations omitted). Under the first prong, the subordinates' conduct must be "pervasive," "meaning that the conduct is widespread, or at least has been used on several different occasions." Id. Hence, a plaintiff will not satisfy the deliberate indifference standard "by pointing to a single incident or isolated incidents[.]" Id. Rather, at a minimum, the plaintiff must demonstrate that the supervisor exhibited "continued inaction in the face of documented widespread abuses." Id. On summary judgment, Defendants Connolly and Hart have denied having any knowledge of a "pervasive" risk of harm to Plaintiff. (Doc. No. 42-2 at ¶¶ 9, 11, 20; Doc. No. 42-6 at ¶¶ 4, 8-10). Moreover, in response to the summary judgment motion, Plaintiff has failed to present any evidence to raise a dispute as to whether Defendants Connolly and Hart had any knowledge of a "pervasive" risk of harm to him. Accordingly, Plaintiff cannot withstand summary judgment as to Defendant Connolly or Hart.[1]

---

[1] Furthermore, even if Plaintiff is contending that Defendants Connolly and Hart somehow personally participated in the alleged constitutional violations, Plaintiff's claims against these two Defendants cannot withstand summary judgment for the same reasons that the Court concludes, infra, that his claims against Defendants Harris and Mayhorn cannot withstand summary judgment.

7

## B. Plaintiff's Due Process Violation Claim Against Defendants Mayhorn and Harris Based on Conditions of Confinement

Plaintiff first brings a conditions-of-confinement claim against Defendants Mayhorn and Harris based on (1) the alleged deprivation of a mattress for an unspecified number of days; (2) alleged unsanitary conditions at the detention center; and (3) the treatment he received as a "mental health patient" while on suicide watch. Here, Plaintiff was a pretrial detainee, rather than a prisoner, at all relevant times. Thus, his claim is properly brought under the Fourteenth Amendment's due process clause, rather than under the Eighth Amendment's cruel and unusual punishment clause. See Bell v. Wolfish, 441 U.S. 520, 535-38 (1979). However, the standards applied in Eighth Amendment conditions-of-confinement cases are essentially the same as those in cases arising under the Fourteenth Amendment for pretrial detainees.[2] In a Fourteenth Amendment conditions-of-confinement claim, a plaintiff must allege facts demonstrating the serious deprivation of a basic human need (the objective prong) and deliberate indifference to the jail conditions by the defendant (the subjective prong). Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). As for the objective prong, "extreme deprivations" are required to make out a conditions-of-confinement claim. Hudson v. McMillian, 503 U.S. 1, 8-9 (1992). To show an

---

[2] The United States Supreme Court recently held that, as to Fourteenth Amendment due process violations alleged by pretrial detainees claiming excessive force, "pretrial detainees (unlike convicted prisoners), cannot be punished at all, much less 'maliciously and sadistically'" and "that the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015). Therefore, "in the absence of an expressed intent to punish, a pretrial detainee can ... prevail [on an excessive force claim] by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Id. at 2473 (quoting Bell v. Wolfish, 441 U.S. 520, 561 (1979)). Thus, at least as to excessive force claims by pretrial detainees, the test is now an objective one, in which the court asks whether the defendants' conduct was reasonable.

extreme deprivation, a prisoner "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," Strickler v. Waters, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions, see Helling v. McKinney, 509 U.S. 25, 33-35 (1993).

First, as to Plaintiff's allegations that he was deprived of a mattress for an unspecified number of days while at the detention center, pretrial detainees do not have a constitutional right to sleep on an elevated bed. See Mann v. Smith, 796 F.2d 79, 85 (5th Cir. 1986); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985). Courts have held that, absent additional egregious factors, sleeping on the floor without a mattress for a short time period is not per se unconstitutional. Payton v. Gusman, No. 12-2578, 2013 WL 5530280, at *8 (E.D. La. Oct. 7, 2013) (sleeping on the concrete floor for three days without a mattress does not give rise a constitutional violation). The Fourth Circuit has not stated definitively how long a pretrial detainee or prisoner can be deprived of a mattress before the deprivation reaches the level of a constitutional violation. Other circuits have provided guidance as to the length of time that is egregious enough to give rise to a constitutional violation. For instance, the Sixth Circuit has held, in a prisoner case, that sleeping without a mattress and other bedding for seven days in the absence of any serious harm does not give rise to a constitutional violation. See Grissom v. Davis, No. 02-1916, 2003 WL 343248, at *2 (6th Cir. Feb. 12, 2003). The Seventh Circuit has held that sleeping on the floor for five days does not give rise to a constitutional violation. See Stephens v. Cottey, No. 05-1804, 2005 WL 1971700, at *1 (7th Cir. Aug. 17, 2005) (pretrial detainee). The Eleventh Circuit has noted that "[o]bjectively speaking, sleeping on a steel bed without a mattress for eighteen days, though uncomfortable, is not so extreme as to violate

9

contemporary standards of decency." Alfred v. Bryant, No. 09-12342, 2010 WL 1881064, at *3 (11th Cir. May 12, 2010) (prisoner). The Eighth Circuit has held that an inmate's constitutional rights were not violated when forced to sleep near the exterior door on a concrete floor without a blanket during the winter for four days. O'Leary v. Iowa State Men's Reformatory, 79 F.3d 82, 84 (8th Cir. 1996) (prisoner). Finally, the Ninth Circuit has held that sleeping on the floor without a mattress for four weeks does not give rise to a constitutional violation. Schroeder v. Kaplan, No. 93-17123, 1995 WL 398878, at *2 (9th Cir. July 7, 1995) (prisoner).

Significantly, here, Plaintiff cannot state how many times Defendants Harris and Mayhorn allegedly refused to give him a mattress. (Doc. No. 42-1 at 7 ("I cannot, not right off the top" state how many times he was denied a mattress)). Moreover, the defendant officers deny ever refusing to give Plaintiff a mattress. (Doc. No. 42-5 at ¶ 4; Doc. No. 42-4 at ¶ 4; Doc. No. 42-6 at ¶ 8). Nonetheless, even assuming that Plaintiff was denied a mattress while in the holding cell on Defendants Harris' and Mayhorn's shifts, the summary judgment evidence shows that, at most, Plaintiff slept on the concrete floor without a mattress on ten different occasions over the course of a month.³ Here, the alleged deprivation of a mattress on ten occasions, over one month's time span while Plaintiff was at the detention center, does not demonstrate the level of deprivation required to establish a violation of Plaintiff's constitutional rights. In his brief in response to the summary judgment motion, with the exception of Plaintiff's own testimony alleging that he was denied a mattress an indeterminate number of times, Plaintiff presents no

---

³ As noted, under the detention center's policy, mattresses are distributed for night sleep at 10:30 p.m. (Doc. No. 42-5 at ¶ 3). Exhibits A to Defendant Harris' and Mayhorn's affidavits include their time sheets for the dates Plaintiff was in the holding cell. The only shifts where Harris and Mayhorn worked nights and could have provided a mattress were: 7/2, 7/3/ 7/6, 7/7, 7/8, 7/11, 7/30, 7/31, 8/3, 8/4, 8/5, 8/8, and 8/9. As a result, and assuming Plaintiff's allegations are true, Defendants could have denied Plaintiff a mattress on ten separate occasions, at the most.

other evidence that he was ever denied a mattress. Finally, Plaintiff has simply not presented evidence on summary judgment that the alleged deprivation of a mattress resulted in serious physical or emotional harm to him, or that Defendants' conduct exposed him to a substantial risk of such harm. See Sears v. Price, No. 5:11-CT-3208-FL, 2014 WL 1266830, at *12 (E.D.N.C. Mar. 26, 2014). Thus, Plaintiff has not raised a genuine dispute of fact on summary judgment as to whether his constitutional rights were violated based on the alleged denial of a mattress while at the detention center.

Plaintiff also brings a due process claim based on alleged unsanitary conditions at the detention center and allegations that he was denied various hygiene products. Plaintiff specifically complains about the conditions of the holding cells within the detention center. Plaintiff was housed in these holding cells on two different occasions. In the first, he spent approximately five days; in the second, he spent approximately 45 days. Plaintiff alleged in the Complaint that "the holding cell's condition was unsanitary due to the massive amount of urine, feces, and vomit on both the floor and walls in which the plaintiff was forced to live in for 30 plus days. Plaintiff was also made to go without a shower sometimes up to 8 or 9 days. There were no sanitary items (soap, paper, towels and at times no toilet paper)." (Doc. No. 1 at 9). Plaintiff also testified in his deposition that Defendant Harris denied him toilet paper "[s]everal different times. While I was at 147 and a couple of times while I was back in." (Doc. No. 42-1 at 7).

Living conditions in prison are often less than ideal. Inmates "cannot expect the amenities, conveniences and services of a good hotel." Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988) (finding that the inmate was not subjected to cruel and unusual punishment due to prison officials' failure to provide him with toilet paper for five days, or with soap, toothbrush,

or toothpaste for ten days).  Prisons need only provide reasonably adequate hygiene and sanitation conditions.  Gates v. Cook, 376 F.3d 323, 342 (5th Cir. 2004).  Moreover, the length of time a prisoner is exposed to unsanitary conditions is crucial to determining whether a constitutional violation occurred.  See, e.g., Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989).  Short-term sanitation problems, while unpleasant, do not amount to constitutional violations.  Whitnack v. Douglas Cnty., 16 F.3d 954, 958 (8th Cir. 1994).

Defendants have presented evidence on summary judgment showing that the holding cells in the detention center are cleaned at least every twelve hours, and that they are cleaned additionally, as needed.  (Doc. No. 42-2 at ¶ 17).  Defendants have further produced evidence showing that the detention center passed appropriate inspections in 2012.  (Id. at ¶¶ 18-19, Doc. No. 42-3 at 2-40: Exs. E-G).  In his response to the summary judgment motion, Plaintiff has presented no evidence to support his allegations regarding the alleged unsanitary conditions of the holding cells during his incarceration, nor has he presented any evidence to show that Defendants were aware of the alleged unsanitary conditions in the holding cell or that Plaintiff was denied personal hygiene items.  In any event, even if the Court were to assume as true Plaintiff's allegations regarding the conditions of the holding cell that he was held in for at most 45 days, the amount of time he was exposed to these conditions is far less than the amount of time deemed sufficient to rise to the level of a constitutional violation.  Indeed, courts have found no constitutional violation in other cases involving similar time periods when the prisoner was allegedly exposed to unsanitary conditions.  See Wagner v. Warden, No. ELH-14-791, 2015 WL 1276749, at *41 (D. Md. Mar. 19, 2015) (finding no constitution violation where, on two separate occasions (one lasting two days and the other lasting a month), the prisoner alleged he was placed in a cell with feces and urine on the floor without a mattress, toiletries, or running

water, where the prisoner did not allege that these conditions caused him to suffer any serious or significant physical or emotional injury, nor did he claim that prison officials knew that these conditions subjected him to any serious danger that they could have averted but failed to do so); Harris, 839 F.2d at 1234-35 (no constitutional violation where, in the absence of any physical harm, an inmate is not given toilet paper for five days and toothpaste for ten days). Finally, as with his claim based on the alleged deprivation of a mattress, Plaintiff has simply not presented evidence on summary judgment that the alleged unsanitary conditions resulted in serious physical or emotional harm to him, or that Defendants' conduct exposed him to a substantial risk of such harm. In sum, Plaintiff has failed to raise a genuine dispute as to whether his due process rights were violated by the alleged unsanitary conditions in the holding cells and denial of various personal hygiene items.

Next, as part of his conditions-of-confinement claim, Plaintiff also contends that he was denied an appropriate housing area as a "mental health" inmate. Plaintiff complains that the holding cell was not "qualified as [a] medical holding [facility]" due to "only [having] a mattress, no facilities, no running water" and due to the fact that "[he] had to get permission for facilities and for water." (Doc. No. 42-1 at 8). Plaintiff has failed to raise a genuine dispute of fact as to whether the conditions of confinement while he was in the holding cell on suicide watch violated his constitutional rights. See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 472 (4th Cir. 1999) (where inmates claimed that prison conditions while in segregation harmed their mental health, observing that negative effects of restrictions on mental health "are unfortunate concomitants of incarceration; they do not, however, typically constitute the 'extreme deprivations . . . required to make out a conditions-of-confinement claim'") (quoting Hudson v. McMillian, 503 U.S. 1, 8-9 (1992)). The

13

conditions of the holding cell in which Plaintiff was housed were an unfortunate but inevitable result of his incarceration and his suicidal intentions. Prison officials were responsible for limiting the opportunities for Plaintiff to harm himself and others. The record on summary judgment, including the inspection reports for the detention center, demonstrates that the conditions alleged to have been unfit for mental health patients clearly meet or exceed minimal standards. (Doc. No. 42-3 at 2-40). Because Plaintiff's allegations regarding his treatment while a mental health patient do not show an extreme deprivation resulting in the denial of a minimal necessity of life, he is unable to withstand summary judgment on this claim.

Additionally, to the extent that Plaintiff has raised this claim as one for deliberate indifference to serious medical needs, Plaintiff has not raised a genuine dispute as to whether there was a denial of a serious medical need. "[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause." Young v. City of Mt. Ranier, 238 F.3d 567, 575 (4th Cir. 2001). To make out a prima facie claim of deliberate indifference, Plaintiff must show "that the defendants actually knew of and disregarded a substantial risk of serious injury to [him] or that they actually knew of and ignored [his] serious need for medical care." Id. at 575-76.

Here, Defendants have produced evidence on summary judgment that prison staff promptly responded to Plaintiff's statements regarding suicide, and the medical record demonstrates that he was provided ongoing care for his various medical complaints. See (Doc. No. 42-8). Even assuming that Plaintiff's purported mental illness created a serious medical need, Plaintiff's allegations regarding his medical treatment do not rise to the level of neglect. For instance, the evidence on summary judgment demonstrates that Plaintiff's illness was not ignored, nor was treatment denied. Plaintiff acknowledged in his deposition that he expressed

14

suicidal intentions to prison staff and medical professionals. (Doc. No. 42-1 at 5; 8). Plaintiff's suicidal intentions placed him, and potentially others, including inmates and staff, at risk of harm. Defendants have shown on summary judgment that the conditions of Plaintiff's confinement were designed to limit his ability and opportunity to inflict harm on himself or others, rather than intended to exacerbate his medical condition. Consequently, Plaintiff has not shown that Defendants' placement of him in a holding cell constituted deliberate indifference.

Plaintiff has also failed to raise a genuine dispute as to whether the prison officials were deliberately indifferent to an alleged deprivation and the substantial risk of harm resulting from the deprivation. Plaintiff has produced no evidence on summary judgment raising a dispute of fact as to whether Defendants had actual knowledge of the alleged risks to him. Defendants, on the other hand, have produced evidence on summary judgment that they lacked knowledge of a substantial risk of harm. See (Doc. No. 42-2 at ¶¶ 9, 20; Doc. No. 42-6 at ¶¶ 4, 8-9; Doc. No. 42-5 at ¶¶ 4-5; 9-10; Doc. No. 42-4 at ¶¶ 4-5, 9-11). The Fourth Circuit has held that "[t]he prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Accordingly, the lack of evidence to support Plaintiff's claim of deliberate indifference is fatal to his claim.

### C. Plaintiff's Due Process Claim Based On Defendants' Alleged Failure to Protect Plaintiff from Another Inmate

Plaintiff next contends that he was assaulted by fellow inmate Marcus Ferguson during his first two weeks in the holding cell, and that Defendants violated his constitutional rights by failing to protect him from this assault. To prevail on a claim against a prison official for failure to protect an inmate from violence by other inmates, an inmate must show: (1) he was

15

incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm. See, e.g., Farmer v. Brennan, 511 U.S. 825, 833-35 (1970).

As an initial matter, while the record evidence shows that fellow inmate Brian Coleman assaulted Plaintiff on May 26, 2012, there is simply no corroborating evidence to demonstrate a subsequent assault by inmate Ferguson, as Plaintiff alleges. Specifically, Plaintiff contends that inmate Ferguson assaulted him on May 28, 2012, while both were housed in Holding Cell 147. However, Defendants have produced evidence on summary judgment showing that there is no record of inmate Ferguson ever being placed in the same holding cell as Plaintiff. (Doc. No. 42-2 at ¶ 6 & Ex. B). Defendants have also produced evidence on summary judgment showing that, at the time Plaintiff alleges inmate Ferguson attacked him, inmate Ferguson was being held in a different part of the jail. (Doc. No. 42-2 at 7-10). More significantly, however, even assuming that Ferguson was placed in Plaintiff's holding cell on May 28, 2012, as Plaintiff contends, Defendants have submitted the timesheet records for Defendants Harris and Mayhorn, and the records show that neither was working on this date. See (Doc. No. 46-1 at 2-3: Ex. A to Defs.' Reply).

In his response to the summary judgment motion, Plaintiff has produced no evidence to dispute Defendants' evidence that inmate Ferguson was never placed in the same holding cell as Plaintiff. Furthermore, even assuming that Plaintiff's allegation of an attack by Ferguson is true, Plaintiff has not produced evidence to raise a genuine dispute on summary judgment as to whether Defendants Harris and Mayhorn were put on notice of a substantial risk of harm by inmate Ferguson. Thus, Plaintiff has simply failed to raise a genuine dispute as to whether

16

Defendants violated his constitutional rights by failing to protect him from an assault by inmate Ferguson.

In sum, Plaintiff fails to raise a genuine dispute of fact as to whether Defendants violated his constitutional rights.[4] Finally, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and those claims are hereby dismissed without prejudice. See 28 U.S.C. § 1367(c)(3).

**IV.    CONCLUSION**

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 42), is **GRANTED**, and this action is dismissed.

2. The Clerk is directed to terminate this action.

Signed:  February 18, 2016

Frank D. Whitney
Chief United States District Judge

---

[4] Because Plaintiff's claims fail as to Defendants in their individual capacities, it follows that Plaintiff's claims against Defendants in their official capacities likewise fail, as he has not raised a genuine dispute of material fact as to whether Plaintiff's constitutional rights were violated, much less by any official custom or policy of the Iredell County Sheriff's Office. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). Defendants have also raised the defense of qualified immunity. Because the Court has found that there was no constitutional violation in the first instance, the Court does not address Defendants' qualified immunity defense.